1   Eric J. Sinrod (SBN 122868)
    Christopher B. Yeh (SBN 262991)
2   DUANE MORRIS LLP
    One Market Plaza
3   Spear Tower, Suite 2200
    San Francisco, CA 94105-1127
4   Tel: (415) 957-3000
    Fax: (415) 957-3001
5   Email: EJSinrod@duanemorris.com
        CBYeh@duanemorris.com
6
    [additional counsel appear on signature page]
7
    Attorneys for Plaintiffs
8   MOUNTAINLAND SUPPLY, LLC and
    MOUNTAIN STATES SUPPLY, LLC
9

**FILED** 

**NOV 1 4 2013**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO/OAKLAND DIVISION       ***JCS***

13

14   MOUNTAINLAND SUPPLY, LLC and          **CV** Case No. **13 5310**
     MOUNTAIN STATES SUPPLY, LLC, on behalf
15   of themselves and all others similarly situated,   **COMPLAINT FOR VIOLATIONS OF**
                                                        **THE FEDERAL ANTITRUST LAWS**
16              Plaintiffs,
                                                        **CLASS ACTION**
17        v.
                                                        **DEMAND FOR JURY TRIAL**
18   AB&I FOUNDRY, TYLER PIPE COMPANY,
     MCWANE, INC., CHARLOTTE PIPE AND
19   FOUNDRY COMPANY, and RANDOLPH
     HOLDING COMPANY,
20
                Defendants.
21

22              **CLASS ACTION COMPLAINT**

23        Plaintiffs, on behalf of themselves and all others similarly situated (the "Class," as defined

24   below), upon personal knowledge as to the facts pertaining to itself and upon information and belief

25   as to all other matters, bring this class action for damages and other relief pursuant to the federal

26   antitrust laws, and demand a trial by jury.

27

28

DM1\4341018.1

1

**INTRODUCTION**

2
3
4
5
6

1.      This is a proposed class action against Defendants AB&I Foundry, Tyler Pipe Company and McWane, Inc. (collectively, "McWane"), and Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (collectively, "Charlotte Pipe"), for violations of the federal antitrust laws in the cast iron soil pipe and fittings (collectively, "CISP") market.  These entities are collectively referred to herein as "Defendants."

7
8
9
10
11
12
13
14
15

2.      This case alleges a conspiracy among all Defendants to fix, raise, maintain and stabilize prices for CISP that they sold directly to Plaintiffs and other class members, which began at least as early as January 1, 2006 and continues through the present.  Additionally, Plaintiffs allege that Charlotte Pipe's 2010 acquisition and liquidation of Star Pipe Products, Ltd.'s ("Star Pipe") CISP business, which resulted in substantially decreased competition in the market for CISP, was an illegal acquisition, undertaken to facilitate and ensure the success of the price-fixing conspiracy herein alleged.  As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class defined below have paid artificially inflated prices for CISP and thus suffered injury of the type the federal antitrust laws are designed to prevent.

16
17
18

3.      Since at least 2006, Defendants and their predecessors have been the primary sellers and manufacturers of CISP in the United States.  Together, McWane and Charlotte Pipe control over 90% of the market for CISP.

19
20
21
22
23

4.      Beginning at least as early as 2006, the Defendants entered into a conspiracy to fix, raise, maintain and stabilize the prices of CISP sold in the United States.  Defendants engaged in various collusive acts, including agreements on CISP price levels, and agreements not to compete with each other at particular customer accounts, in order to facilitate price increases and further the goals of their unlawful conspiracy.

24
25
26
27
28

5.      Defendants were able to effectuate this conspiracy easily, as they constitute the only members of the Cast Iron Soil Pipe Institute ("CISPI") trade association, and thus had numerous opportunities to communicate and collude at CISPI events and meetings, as well as other industry functions.  CISPI facilitated communications and information-sharing among the Defendants about prices, customers, and confidential, commercially-sensitive information.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS

1       6.     Following these conspiratorial discussions at trade association meetings, Defendants

2  would announce identical price increases, typically in the autumn to be effective in January.

3       7.     In 2007, Star Pipe entered the CISP market and began to compete with Charlotte Pipe

4  and McWane for a share of the CISP market. Star Pipe's entrance in the market threatened

5  Defendants' supra-competitive pricing and increased competition in the market.

6       8.     In July 2010, Charlotte Pipe, through its subsidiary Randolph Holding Company,

7  purchased the CISP assets of Star Pipe, further effectuating the supra-competitive price-fixing

8  scheme being implemented by the Defendants. The purchase agreement included non-compete and

9  confidentiality clauses for many of Star's top CISP executives.

10       9.     Following the purchase, Charlotte Pipe destroyed Star Pipe's CISP assets and

11  shuttered its CISP foundries. Charlotte Pipe previously had engaged in similar conduct to eliminate

12  actual and potential competitors, and to maintain and further the Defendants' implementation of their

13  price-fixing conspiracy by purchasing smaller competitors in the CISP market only to sell off their

14  assets and close their operations.

15       10.    The effect of Charlotte Pipe's purchase of Star Pipe's CISP business was to lessen

16  competition in the CISP market and to pave the way for Charlotte Pipe and McWane to continue to

17  fix and set prices.

18       11.    The United States Federal Trade Commission ("FTC") launched an investigation into

19  Charlotte Pipe's acquisition of Star Pipe's CISP business, resulting in the FTC's filing of an

20  administrative complaint April 2, 2013 against Charlotte Pipe. Subsequently, Charlotte Pipe entered

21  into a Consent Agreement prohibiting it from engaging in certain anti-competitive activities.

22       12.    Due to the Defendants' conspiracy and actions to keep competitors out of the CISP

23  market, prices for CISP have increased steadily since at least 2006, despite declining demand in the

24  United States.

25       13.    Defendants' conduct alleged herein has unlawfully and unreasonably restrained

26  competition and led to artificially inflated prices for CISP.

27       14.    Plaintiffs bring this action on behalf of themselves and similarly situated direct

28  purchasers of CISP in the United States from one or more of the Defendants from 2006 through the

1  present (the "Class Period").

2  ## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

3      15.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

4  15 and 26, to obtain injunctive relief and recover treble damages and costs of suit, including

5  attorneys' fees, against Defendants for the injuries that Plaintiffs and the other members of the Class

6  have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and

7  Section 7 of the Clayton Act, 15 U.S.C. § 18.

8      16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

9  1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, because this

10  action arises under the federal antitrust laws.

11      17.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4

12  and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, because, during the Class Period, Defendants

13  resided, transacted business, were found, or had agents within this District, and a portion of the

14  affected interstate trade and commerce discussed below was carried out in this District.

15      18.    Assignment to this Division is proper pursuant to Civil L.R. 3-5, because a substantial

16  part of the events or omissions giving rise to the claims alleged herein occurred in San Francisco and

17  Alameda Counties.

18      19.    This Court has personal jurisdiction over each Defendant because each Defendant (a)

19  transacted business throughout the United States, including in this District; (b) sold CISP throughout

20  the United States, including in this District; (c) had substantial contacts with the United States,

21  including in this District; or (d) committed one or more overt acts in furtherance of their illegal

22  price-fixing scheme and acquisition in the United States.  In addition, the conspiracies and illegal

23  acquisition alleged below were directed at, and had the intended effect of, causing injury to persons

24  residing in, located in, or doing business throughout the United States, including in this District.

25  ## PARTIES

26      20.    Plaintiff Mountainland Supply, LLC ("Mountainland") is a Utah limited liability

27  company with its principal place of business in Orem, Utah.  Mountainland purchased CISP directly

28  from one or more Defendants during the Class Period.

DM1\4341018.1                                 4

21.     Plaintiff Mountain States Supply, LLC ("Mountain States") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah. Mountain States purchased CISP directly from one or more Defendants during the Class Period.

22.     Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621. AB&I was acquired by McWane, Inc. in late 2006, and since that time AB&I has been a division of and controlled by McWane, Inc.

23.     Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama 35234.

24.     Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas 75706. At all relevant times, Tyler Pipe has been a division of and owned and controlled by McWane, Inc.

25.     Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207.

26.     Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a limited liability company organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207.

## AGENTS AND CO-CONSPIRATORS

27.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

28.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

29.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States,

1   including in this District.

2       30.     During the Class Period, Defendants manufactured, sold and shipped CISP in a

3   continuous and uninterrupted flow of interstate commerce.  The price-fixing conspiracy and other

4   anticompetitive conduct in which the Defendants participated had a direct, substantial, and

5   reasonably foreseeable effect on interstate commerce.

6                              **RELEVANT MARKETS**

7       31.     The relevant product market for purposes of this Complaint is the market for the sale

8   of CISP for use in commercial, industrial, and multi-story residential buildings in the United States.

9       32.     The relevant geographic market for purposes of this Complaint is the United States.

10                             **FACTUAL ALLEGATIONS**

11                          **Cast Iron Soil Pipe and Fittings**

12      33.     CISP is primarily used in buildings for sanitary and storm drain, waste, and vent

13  piping applications.  CISP is used in residential, commercial and industrial construction.

14      34.     CISP has been used in the United States since the beginning of the 19th century,

15  when it replaced wooden systems.  In the early part of the 21st century, production of CISP

16  fluctuated with demand and periods of new construction.

17      35.     CISP is manufactured predominantly from cast iron.  Cast iron is a generic term that

18  refers to a series of alloys primarily made of iron, carbon, and silicon.  Cast iron may also contain

19  trace amounts of other materials such as manganese, sulfur, and phosphorous.

20      36.     Numerous state and local building codes require the use of CISP for certain types of

21  construction.

22      37.     CISP has numerous characteristics that make it particularly well-suited for drain,

23  waste, vent, and sewer plumbing applications, including resistance to corrosion and abrasion.

24      38.     The methods for joining CISP together in various configurations make it versatile

25  Additionally, it can be installed both above and below flooring, as well as underground, as the

26  following figure demonstrates:

27

28

DM1\4341018.1                              6

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15 Figure 1 - Typical Housing CISP Pipe Layout

16     39.    CISP is classified into two major types—"Hub and Spigot" and "Hubless." Hubless
17 CISP is also called "No-Hub." The method of joining No-Hub pipe and fittings utilizes a metallic
18 shielded hubless coupling that telescopes over the plain ends of the pipe and fittings and is torqued
19 to seal the joint. Hub and Spigot pipe and fittings have "hubs" into which the spigot (plain end) of
20 the pipe or fitting is inserted. The joint is sealed with a rubber compression gasket or molten lead
21 and oakum. The following figures illustrate the two types of CISP:

22
23
24
25
26
27
28

DM1\4341018.1

7

BARREL

HUB

SPIGOT

SINGLE-HUB PIPE

BARREL

HUB

HUB

DOUBLE-HUB PIPE

Figure 2 - Traditional hub and spigot CISP.



Figure 3 - No-Hub Pipe and Hubless Coupling

40.    While No-Hub pipes come in only one standard thickness, Hub and Spigot pipe comes in a standard thickness, called service weight, and also an "extra heavy" thickness.

41.    CISP fittings include various designs and sizes, consisting of bends, tees, wyes, traps, drains, and other special fittings. The following figure illustrates some of the different types of CISP fittings:



Figure 4 - Various CISP fittings

## The CISP Industry

42.     The most frequent purchasers of CISP are plumbing wholesalers. End-users of CISP include construction companies, plumbers and developers.

43.     Fifty-nine percent of the CISP produced is 3-inch and 4-inch in circumference, 25% is 1 12-inch and 2-inch, and 16% is 5-inch and over.

44.     Fittings constitute roughly a quarter of the total tonnage of CISP combined production.

45.     CISP is delivered to purchasers across the United States and is generally shipped directly to the job site from the manufacturer via truck.

46.     According to U.S. Census data, the annual value of CISP shipped in the U.S. between 2004 and 2011 was between \$350,000,000 and \$450,000,000.

## Market Characteristics Conducive to Collusion

### Limited Number of Producers

47.     There are only three producers of CISP in the United States: Charlotte Pipe; AB&I; and Tyler Pipe. Both Tyler Pipe and AB&I are divisions of McWane.

48.     McWane and Charlotte Pipe together account for over 90% of the market for CISP. The FTC has described the industry as "highly concentrated." And the exit of Star Pipe from the market "substantially increased the level of concentration in the relevant market[]."

DM1\4341018.1                                    9

1    49.    In fact, the industry is so concentrated that in 2007 and 2009 the U.S. Census
2    withheld reporting CISP data specifically because there was a risk that with so few producers, the
3    release of data would enable the public to identify proprietary company information even from the
4    aggregate data.

**High Barriers to Entry**

6    50.    There are significant barriers to entry and expansion to new entrants to the CISP
7    market. First, there are substantial costs associated with either building or acquiring a foundry as
8    well as the specialty manufacturing tools necessary to produce CISP. For example, Star Pipe's CISP
9    assets that were acquired by Charlotte Pipe, which constituted a very small percentage of the market
10   overall, still sold for $19 million.

11   51.    Additionally, a new entrant would have to develop a distribution network and
12   relationships with both plumbing distributors and end-users.

13   52.    Finally, manufacturers must be able to produce both the most commonly requested
14   CISP, and also less common types of CISP, in order to offer a full line of CISP products to
15   customers.

**Product Homogeneity**

17   53.    CISP is a commodity-like product, and Defendants' products are produced to
18   industry-wide standards. Because all CISP is standardized and must meet strict American Society
19   for Testing and Materials requirements, manufacturers of CISP compete mainly on price. This
20   product homogeneity enhanced Defendants' ability to collude on prices and to detect deviations
21   from those collusively set prices.

**Price Inelasticity**

23   54.    If a given change in price triggers a smaller proportionate change in the quantity
24   demanded, then the demand for the good or service is said to be inelastic.

25   55.    Demand for CISP is inelastic because there is no functional substitute for CISP.
26   Plastic pipes, such as PVC or ABS pipe, are not a substitute for CISP because CISP has several
27   properties that plastic pipe cannot replicate, such as:

28

DM1\4341018.1                                    10

1       a.    CISP's acoustical characteristics make it more effective in reducing plumbing noise
2   than other materials.

3       b.    Unlike other materials, cast iron has high crush strength and resistance to tree roots,
4   penetration by rodents, and failure because of ground shifts. Unlike plastic pipe, no special bedding
5   is required to support CISP.

6       c.    The thermal expansion and contraction of cast iron is far less than that of other
7   materials, such that failures from expansion and contraction due to extreme cold and heat are
8   virtually impossible.

9       d.    Unlike other materials, CISP is noncombustible and will not burn in the event of a
10  building fire.

11      56.    Ductile Iron Pipe is not a substitute product because it comes in much larger sizes and
12  is used mainly for large waterworks projects, whereas CISP is much smaller and is used for drain
13  waste and vent plumbing inside residential and commercial properties.

14      57.    Additionally, state, municipal and local codes often require the use of CISP, as
15  opposed to plastic piping, which means that there is no potential alternative for CISP in those areas.

16  **Defendants Had Many Opportunities to Collude**

17      58.    Defendants (and affiliated entities) comprise the only members of a trade association
18  called the CISPI. CISPI was organized in 1949 by the leading American CISP manufacturers. At
19  the time of its inception, it included 24 manufacturers. Today, it includes only the three
20  Defendants—two of which are divisions of Defendant McWane—and other entities owned and
21  controlled by Defendants. Defendants are CISPI's sole funders and supporters.

22      59.    As the only members of CISPI, Defendants have had numerous opportunities to
23  discuss pricing at CISPI events. Executives and managers from Defendants attend CISPI events
24  together at least twice per year.

25      60.    CISPI is used by Defendants as a mechanism to facilitate communication and
26  coordination of their activities, including price-fixing, maintaining their market shares, and
27  excluding foreign competition. The Executive Vice President of CISPI, Bill LeVan, has
28  communicated—in writing or by telephone—to Defendants on numerous occasions for the purpose

DM1\4341018.1     11

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS

1    of alerting Defendants that CISP customers were being solicited by foreign manufacturers. LeVan
2    also has provided weekly reports to Defendants that provided information concerning bidding and
3    pricing information. In addition, CISPI has been used to communicate information directly between
4    Defendants about potential competitive threats posed by importers.

5         61.     Senior officials from Defendants have participated in bi-annual CISPI meetings to
6    effectuate the conspiracy described herein. These meetings have included Bill LeVan, Allan
7    Boscatti (President and CEO of AB&I), Frank Dowd (CEO of Charlotte Pipe), Roddy Dowd (former
8    President of Charlotte Pipe), Don Waugaman (formerly Vice President of Sales at Tyler and
9    currently Vice President of Sales at Charlotte Pipe), Patrick Starkey (Vice President of Sales at
10   Tyler), and Bill Bliss (Executive Vice President of Tyler). Shortly after certain of these meetings,
11   and before any public announcement, Starkey, Bliss or Sterling Bowman (Tyler's National Sales
12   Manager) reported to Tyler employees that Tyler would increase CISP prices and that Charlotte
13   would do the same.

14        62.     In addition to their coordinated activities through CISPI, Defendants' executives also
15   attended annual meetings of the American Supply Association, which counts CISP manufacturers as
16   participants. This association provided further opportunities to discuss and implement the unlawful
17   conspiracy described herein.

18        63.     Other trade associations, such as the American Water Works Association, held
19   conferences and meetings, which provided additional opportunities for Defendants to come together
20   and discuss and set prices.

21                          **The Price-Fixing Conspiracy**

22        64.     Defendants—as the dominant suppliers in the market—have been fixing CISP prices
23   since at least 2006. Defendants' CISP list prices, rebates, and multipliers (which are percentages
24   multiplied by a given list price to arrive at the respective transaction price) have been maintained in
25   lockstep with each other during the course of the conspiracy.

26        65.     In 2005 or 2006, an employee in Charlotte Pipe's cast iron foundry in North Carolina
27   learned that Charlotte Pipe and the McWane companies were fixing prices of CISP. He learned this
28   from Charlotte's plant manager, Marshall Coble. Specifically, Mr. Coble stated, during the course

DM1\4341018.1                                      12

1    of a meeting at the foundry, that the CISP manufacturers met at the bi-annual trade association

2    meeting that Summer or Fall to discuss and agree on pricing for CISP. When the employee

3    challenged the plant manager about the legality of such actions, the plant manager quickly brushed

4    his concerns aside and moved on to another topic.

5        66.    Defendants often announced identical price increases very close in time to one

6    another and soon after that trade association meeting occurred. For instance, in early September

7    2010, both Charlotte Pipe and AB&I announced a future price increase of 7.5% set to take effect on

8    January 1, 2011.

9        67.    Defendants posted prices for the most common sizes of CISP, all effective the first of

10   the year, mirror each other exactly. These identical prices are reflected, for example, in the price

11   lists by Defendants set forth in the following figure:

| Year | Part | Charlotte Pipe | AB&I | Tyler Pipe |
|------|------|----------------|------|------------|
| 2006 | 3" x 10' No-Hub Pipe | $103.20 | $103.20 | $103.20 |
|      | 4" x 10' No-Hub Pipe | $134.00 | $134.00 | $134.00 |
|      | 3" No-Hub 1/4 Bend | $15.10 | $15.10 | $15.10 |
|      | 4" No-Hub 1/8 Bend | $16.00 | $16.00 | $16.00 |
|      | 4" x 3" Wye | $28.50 | $28.50 | $28.50 |
|      | 3" x 10' Single Hub Pipe | $103.20 | $103.20 | $103.20 |
|      | 4" x 10' Single Hub Pipe | $134.00 | $134.00 | $134.00 |
|      | 3" Hub & Spigot 1/4 Bend | $23.80 | $23.80 | $23.80 |
|      | 4" Hub & Spigot 1/8 Bend | $29.10 | $29.10 | $29.10 |
| 2007 | 3" x 10' No-Hub Pipe | $108.60 | $108.60 | $108.60 |
|      | 4" x 10' No-Hub Pipe | $141.10 | $141.10 | $141.10 |
|      | 3" No-Hub 1/4 Bend | $15.90 | $15.90 | $15.90 |
|      | 4" No-Hub 1/8 Bend | $16.80 | $16.80 | $16.80 |
|      | 4" x 3" Wye | $30.00 | $30.00 | $30.00 |

DM1\4341018.1                                    13

| | | 3" x 10' Single Hub Pipe | $108.60 | $108.60 | $108.60 |
|---|---|---|---|---|---|
| | | 4" x 10' Single Hub Pipe | $141.10 | $141.10 | $141.10 |
| | | 3" Hub & Spigot 1/4 Bend | $25.10 | $25.10 | $25.10 |
| | | 4" Hub & Spigot 1/8 Bend | $30.60 | $30.60 | $30.60 |
| | 2009 | 3" x 10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| | | 4" x 10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| | | 3" No-Hub 1/4 Bend | $16.90 | $16.90 | $16.90 |
| | | 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| | | 4" x 3" Wye | $31.40 | $31.40 | $31.40 |
| | | 3" x 10' Single Hub Pipe | $122.90 | $122.90 | $122.90 |
| | | 4" x 10' Single Hub Pipe | $159.70 | $159.70 | $159.70 |
| | | 3" Hub & Spigot 1/4 Bend | $28.40 | $28.40 | $28.40 |
| | | 4" Hub & Spigot 1/8 Bend | $34.60 | $34.60 | $34.60 |
| | 2010 | 3" x 10' No-Hub Pipe | $117.30 | $117.30 | $117.30 |
| | | 4" x 10' No-Hub Pipe | $152.30 | $152.30 | $152.30 |
| | | 3" No-Hub 1/4 Bend | $17.50 | $17.50 | $17.50 |
| | | 4" No-Hub 1/8 Bend | $19.00 | $19.00 | $19.00 |
| | | 4" x 3" Wye | $32.40 | $32.40 | $32.40 |
| | | 3" x 10' Single Hub Pipe | $129.40 | $129.40 | $129.40 |
| | | 4" x 10' Single Hub Pipe | $168.20 | $168.20 | $168.20 |
| | | 3" Hub & Spigot 1/4 Bend | $29.90 | $29.90 | $29.90 |
| | | 4" Hub & Spigot 1/8 Bend | $36.50 | $36.50 | $36.50 |
| | 2011 | 3" x 10' No-Hub Pipe | $126.80 | $126.80 | $126.80 |
| | | 4" x 10' No-Hub Pipe | $164.60 | $164.60 | $164.60 |
| | | 3" No-Hub 1/4 Bend | $18.90 | $18.90 | $18.90 |
| | | 4" No-Hub 1/8 Bend | $20.50 | $20.50 | $20.50 |
| | | 4" x 3" Wye | $35.00 | $35.00 | $35.00 |

| | | 3" x 10' Single Hub Pipe | $139.90 | $139.90 | $139.90 |
|---|---|---|---|---|---|
| | | 4" x 10' Single Hub Pipe | $181.80 | $181.80 | $181.80 |
| | | 3" Hub & Spigot 1/4 Bend | $32.30 | $32.30 | $32.30 |
| | | 4" Hub & Spigot 1/8 Bend | $39.50 | $39.50 | $39.50 |
| | **2012** | 3" x 10' No-Hub Pipe | $136.30 | $136.30 | $136.30 |
| | | 4" x 10' No-Hub Pipe | $177.00 | $177.00 | $177.00 |
| | | 3" No-Hub 1/4 Bend | $20.30 | $20.30 | $20.30 |
| | | 4" No-Hub 1/8 Bend | $22.00 | $22.00 | $22.00 |
| | | 4" x 3" Wye | $37.60 | $37.60 | $37.60 |
| | | 3" x 10' Single Hub Pipe | $150.40 | $150.40 | $150.40 |
| | | 4" x 10' Single Hub Pipe | $195.50 | $195.50 | $195.50 |
| | | 3" Hub & Spigot 1/4 Bend | $34.70 | $34.70 | $34.70 |
| | | 4" Hub & Spigot 1/8 Bend | $42.50 | $42.50 | $42.50 |
| | **2013** | 3" x 10' No-Hub Pipe | $143.50 | $143.50 | $143.50 |
| | | 4" x 10' No-Hub Pipe | $186.30 | $186.30 | $186.30 |
| | | 3" No-Hub 1/4 Bend | $21.40 | $21.40 | $21.40 |
| | | 4" No-Hub 1/8 Bend | $23.20 | $23.20 | $23.20 |
| | | 4" x 3" Wye | $39.60 | $39.60 | $39.60 |
| | | 3" x 10' Single Hub Pipe | $158.30 | $158.30 | $158.30 |
| | | 4" x 10' Single Hub Pipe | $205.80 | $205.80 | $205.80 |
| | | 3" Hub & Spigot 1/4 Bend | $36.50 | $36.50 | $36.50 |
| | | 4" Hub & Spigot 1/8 Bend | $44.70 | $44.70 | $44.70 |

Figure 5 – Sample of identical price lists

68.     Due to the conspiracy, Defendants have been able to maintain and/or raise prices without regard to market demand. As shown in the figure below, Defendants have steadily increased prices since January 1, 2006 even though construction spending—a prime determinant of CISP demand—has fallen significantly during that time. During this period, Defendants raised prices

DM1\4341018.1                                      15

1  more than 50% although total construction spending declined significantly.

2  **Total Construction Spending Index and CISP PPI**

3  **Comparison**



12  Figure 6 - Comparison of CISP PPI with Construction Spending

13  69.    These price increases also have significantly exceeded changes in the cost of

14  manufacturing CISP during this time period. The primary cost determinants for CISP— including

15  scrap iron and natural gas—have increased at rates substantially less than the price increases set

16  forth above.

17  70.    In addition to the aforementioned activities, Defendants also agreed to limit

18  competition for "each other's" customers. For example, sales representatives at Tyler were trained

19  and directed by Patrick Starkey and Bill Bliss to stay away from Charlotte Pipe's CISP customers

20  and maintain their current market position, rather than trying to seek business from Charlotte Pipe's

21  customers.

22  **The Acquisition Of Star Pipe's CISP Business Furthered The Conspiracy**

23  71.    In 2007, Star Pipe entered the CISP market. Prior to that time, Star Pipe had

24  produced and sold, among other things, ductile iron pipe fittings products. Star Pipe sought

25  membership in CISPI—which Defendants controlled—but was not permitted to join.

26  72.    McWane and Charlotte Pipe had significant concerns about the potential impact of

27  Star Pipe's entry—particularly as Star Pipe's market position strengthened over time—and the

28

DM1\4341018.1                                         16

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS

impact this entry would have on competitive conditions in the CISP market and their ability to maintain a price-fixing scheme.

73. Star Pipe's potential growth as a competitor posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy. Just as Defendants had, through their participation and control of CISPI, taken coordinated steps to exclude competition by importers, actions were taken to foreclose competition by Star Pipe. Specifically, in 2010, Charlotte Pipe commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy. Charlotte Pipe's anti-competitive actions were in furtherance of the conspiracy because they eliminated the potential threat to the conspiracy presented by Star Pipe.

74. On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe, which allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business, including Star Pipe's CISP inventory, production equipment, business records and customer lists. Charlotte Pipe paid approximately $19 million for the Star Pipe CISP assets. Shortly after acquiring the Star Pipe assets, Charlotte Pipe had all such equipment destroyed.

75. The parties also signed an agreement that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in North America for six years after the date the agreement was signed. And Star Pipe agreed to send a letter to its customer list stating that it had decided to exit the CISP business.

76. Several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.

77. The Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased in recent history. According to the FTC Complaint, Charlotte Pipe acquired the CISP assets of other potential competitors, including Matco-Norca in 2009. If a small CISP company posed a risk of stimulating price competition in the CISP market, Charlotte Pipe has purchased the company in order to shut down production and destroy any CISP assets. The elimination of these competitors, like the activities coordinated through CISPI, has facilitated Defendants' ability to maintain and enforce their price-fixing conspiracy.

78. In 2013, the FTC challenged the acquisition, alleging that Charlotte Pipe had violated

1  Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade
2  Commission Act, as amended, 15 U.S.C. § 45. The FTC issues such complaints when it has "reason
3  to believe that the law has been or is being violated, and it appears to the Commission that a
4  proceeding is in the public interest."

5      79.    The FTC subsequently entered into a consent agreement with Charlotte Pipe to
6  "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron
7  soil pipe business of Star Pipe."

8      80.    The consent agreement mandated that for the ten years following its execution,
9  Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the
10  manufacture or sale of CISP products in order for the FTC to "guard against future anticompetitive
11  transactions." It further mandated that Charlotte Pipe inform its customers and the public of the
12  acquisition of Star Pipe, as well as its previous CISP acquisitions. It also invalidated the non-
13  compete and confidentiality clauses contained in the Star Asset Purchase Agreement.

14                          **FRAUDULENT CONCEALMENT**

15      81.    Plaintiffs and members of the Class did not discover, and could not have discovered
16  through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on
17  or about April 2, 2013, when the FTC's redacted complaint was filed.

18      82.    Because Defendants' alleged conspiracy was kept secret until April 2, 2013, Plaintiffs
19  and members of the Class before that time were unaware of Defendants' unlawful conduct alleged
20  herein, and they did not know before that time that they were paying supra-competitive prices for
21  CISP throughout the United States during the Class Period.

22      83.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the
23  conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

24      84.    Defendants' conspiracy was inherently self-concealing. Cast iron soil pipe and
25  fittings are not exempt from antitrust regulation, and thus, before April 2, 2013, Plaintiffs reasonably
26  considered it to be a well-regulated, competitive industry.

27      85.    In the context of the circumstances surrounding Defendants' pricing practices,
28  Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable

person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered CISP prices before April 2, 2013.

86. Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

87. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated.

88. None of the facts or information available to Plaintiffs and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date. Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (nonpublic) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for CISP. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, communications and agreements. If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

89. Although Defendants' price increase announcements, including in the form of new price lists, during the Class Period sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were

1    legitimate and were the result of competitive market forces. Customers also were told that price

2    increases were needed because raw material costs were increasing. Such statements were false and

3    misleading, because at times costs were not increasing and announcements and price lists never

4    included the real reason for price increases, namely Defendants' secret conspiracy.

5         90.    For example, Defendants acted in furtherance of the conspiracy, and helped conceal

6    the conspiracy, through communications such as the following:

7    •    In May 2007, AB&I told customers that "[i]t is ABI's policy to give the market as

8         much notice as possible regarding a price increase, since contractors and others need

9         to plan their jobs so far in advance." This statement was misleading because advance

10        notice of price increases was also important to ensure that the conspirators would

11        adhere to their price- fixing agreement and implement price increases on the same

12        date.

13   •    In March 2008, AB&I falsely told customers that its price increase was "simply a cost

14        pass-through" because earlier increases were insufficient to cover the rise in scrap

15        iron prices. AB&I indicated that "it has become necessary to increase prices to

16        recover these added costs of production." AB&I indicated that future price increases

17        might be necessary to cover cost changes.

18   •    In November 2009, AB&I falsely told customers that it was increasing prices after

19        trying "to put off this price increase for as long as we could." AB&I represented that

20        "[a]s in all price increases, this one came after weeks of deliberation. The disturbance

21        such increases can cause to our valued customers is a regrettable effect, but this effect

22        must be weighed against the impacts of NOT raising prices to stay in line with costs."

23        ABI told customers that the "scrap iron market is a small subset of the ferrous metals

24        market, and AB&I's scrap iron costs are inextricably linked to world steel demand.

25        Any growth in world steel demand produces upward pressure on scrap iron prices.

26        World demand for steel has steadily increased since April 2009, according to the

27        World Steel Association. In fact, China produced more steel in August, 2009 than in

28        any other month in its history. Despite falling demand in U.S. commercial

1                      construction, AB&I is experiencing rising raw material costs."

2          • On September 1, 2010, Charlotte Pipe falsely told customers that price increases were

3              the result of cost increases in raw materials and operating expenses and that as a

4              result of cost increases, prices would remain at higher levels through 2011.

5          • In September 2010, AB&I falsely told customers that because of raw material cost

6              increases it was announcing a commensurate increase in CISP prices.

7          • On September 7, 2011, Charlotte Pipe announced price increases and falsely

8              attributed these increases to cost increases in scrap iron and other major raw

9              materials.

10         • On September 20, 2011, Charlotte Pipe falsely told customers that it was increasing

11             prices "[d]ue to cost increases in scrap iron and other major raw materials as well as

12             increases in general operating expenses."

13        91.     Defendants' statements justifying their price increases throughout the Class Period

14 were designed to create, and did create the impression that these increases were based on

15 competitive market forces. These statements were false and misleading, and constituted affirmative

16 and overt acts of concealment of the conspiracy, because Defendants' price increases were a result of

17 the affirmatively and fraudulently concealed conspiracy set forth herein. Indeed, even statements

18 about the alleged cost justifications for price increases were misleading, and lulled Plaintiffs and

19 other customers into believing that price increases were based on legitimate market forces, because

20 customers were never alerted to Defendants' secret meetings, agreements and cooperation with each

21 other as set forth above. As a result of this misleading conduct, Defendants' customers, including

22 Plaintiffs and members of the Class, were conditioned by experience in dealing with Defendants in

23 what they believed to be a competitive industry to expect price increases from time to time, and to

24 believe that this was the result of normal market forces, rather than the product of an illegal

25 conspiracy.

26        92.     Defendants and their co-conspirators engaged in a successful anti-competitive

27 conspiracy concerning CISP, which they affirmatively concealed, at least in the following respects:

28        a.     By communicating secretly to discuss customers and prices of CISP in the United

DM1\4341018.1                           21

1    States;

2    b.    By meeting at trade association meetings to discuss and fix prices;

3    c.    By issuing or justifying price increase announcements based on false and/or

4          misleading reasons, including cost increases; and

5    d.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature

6          and substance of the acts and communications in furtherance of their illegal scheme.

7    93.    As a result of Defendants' fraudulent concealment, all applicable statutes of

8    limitations affecting Plaintiffs claims and the claims of the Class have been tolled.

9                              **VIOLATIONS OF THE ANTITRUST LAWS**

10   94.    Beginning by at least January 1, 2006 and continuing through the present, Defendants

11   have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to

12   artificially raise, fix, maintain, or stabilize the prices of CISP in the United States.

13   95.    Defendants engaged in anticompetitive activities, the purpose and effect of which

14   were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States. These

15   activities included:

16   a.    participation in meetings, conversations, and communications to discuss the price and

17         pricing terms for the sale of CISP in the United States;

18   b.    agreeing during those meetings, conversations, and communications to charge prices

19         at specified levels, to allocate customers, and to otherwise fix, raise, maintain, or

20         stabilize prices of CISP sold in the United States; and

21   c.    taking numerous steps, as set forth above, to implement and maintain the conspiracy.

22   96.    Defendants and their co-conspirators engaged in the activities described above for the

23   purpose of effectuating the unlawful agreements described in this Complaint.

24   97.    Charlotte Pipe's acquisition of Star Pipe's CISP business resulted in decreased market

25   competition and increased concentration in the market for CISP.

26   98.    Throughout the Class Period, Plaintiffs and the other Class members purchased CISP

27   from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

28   99.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint

DM1\4341018.1                                22

1  of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and

2  Section 7 of the Clayton Act, 15 U.S.C. § 18.

3  **ANTI-COMPETITIVE EFFECT**

4      100.    As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members

5  have been injured in their business and property because they have paid more for CISP than they

6  would have paid absent collusion.

7      101.    Defendants' unlawful contract, combination, or conspiracy has had at least the

8  following effects:

9      a.    price competition in the market for CISP has been artificially restrained;

10      b.    prices for CISP sold by Defendants have been raised, fixed, maintained, or stabilized

11          at supra-competitive levels; and

12      c.    purchasers of CISP from Defendants have been deprived of the benefit of free and

13          open competition in the market for CISP.

14  **CLASS ALLEGATIONS**

15      102.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules

16  of Civil Procedure on behalf of a class (the "Class") consisting of:

17          All persons or entities that purchased cast iron soil pipes or cast iron soil
        pipe fittings in the United States directly from any of the Defendants, their

18          subsidiaries, predecessors, or affiliates, from January 1, 2006 through the
        present (the "Class Period"). Excluded from the Class are Defendants,

19          their parent companies, subsidiaries, predecessors, and affiliates, any co-
        conspirators, federal and state governmental entities and instrumentalities

20          of federal and state governments.

21      103.    The Class is so numerous that joinder of all members is impracticable. On

22  information and belief, hundreds, if not thousands, of individuals and entities purchased CISP from

23  the Defendants during the Class Period.

24      104.    Plaintiffs' claims are typical of the claims of the members of the Class because

25  Plaintiffs and all Class members share the same injury, as they were all damaged by the actions of

26  Defendants, which caused them to pay artificially inflated prices for CISP.

27      105.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

28  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

DM1\4341018.1             23

106. Plaintiffs are represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

107. This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

   a. Whether Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain prices of CISP sold in the United States;

   b. Whether Defendants agreed to allocate customers;

   c. The duration and extent of the conspiracy;

   d. Whether each Defendant was a participant in any such conspiracy;

   e. Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

   f. Whether the conspiracy had the effect of artificially inflating the price of CISP sold in the United States during the Class Period;

   g. Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market;

   h. Whether the conduct of Defendants caused injury to Class members;

   i. The measure and amount of damages incurred by the Class; and

   j. Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

108. Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF:**

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

109.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 108 above.

110.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Defendants' agreement to fix, raise, maintain and stabilize the prices of cast iron soil pipes and fittings in the United States was a violation of the Sherman Act.

111.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

112.    Beginning at least as early as January 1, 2006, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices for CISP sold in the United States.

113.    Defendants' anti-competitive acts were intentionally directed at the market for CISP and had a substantial and foreseeable effect on interstate commerce throughout the United States.

114.    Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the CISP market.

115.    As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiffs and other members of the Class have been injured in their business and property. Plaintiffs and other Class members have been harmed by being forced to pay higher prices for CISP than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

116.    In formulating and carrying out their unlawful agreement, understanding, combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of

DM1\4341018.1                                 25
COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS

1 | conduct set forth herein.

2 |     117.   Defendants' contract, combination, and conspiracy in restraint of trade had the

3 | following effects, among others:

4 |     a.   Price competition in the CISP market has been restrained, suppressed and/or

5 |     eliminated in the United States;

6 |     b.   Prices for CISP sold by Defendants have been fixed, raised, maintained and stabilized

7 |     at artificially high, supra-competitive levels throughout the United States; and

8 |     c.   Plaintiffs and members of the Class have been deprived of the benefits of free and

9 |     open competition.

10 |     118.   Accordingly, Plaintiffs and the Class seek damages, to be trebled pursuant to federal

11 | antitrust law, and costs of suit, including attorneys' fees.

12 | **SECOND CLAIM FOR RELIEF:**

13 | **Illegal Merger Under Section 7 of the Clayton Act**

14 |     119.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 108 of this

15 | Complaint.

16 |     120.   Charlotte Pipe's acquisition of Star Pipe violated Section 7 of the Clayton Act, 15

17 | U.S.C. § 18, because it has substantially lessened competition and/or tended to create a monopoly in

18 | the relevant market.

19 |     121.   The acquisition eliminated actual, direct, and substantial competition between

20 | Charlotte Pipe and Star Pipe.

21 |     122.   The acquisition increased concentration in the market for CISP and increased

22 | Defendants' ability to exert market power.

23 |     123.   The acquisition has caused, and will continue to cause, severe anticompetitive effects

24 | in the relevant market, including but not limited to price increases above competitive levels.

25 | **DEMAND FOR JURY TRIAL**

26 |     124.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a

27 | jury trial as to all issues triable by a jury.

28 |

DM1\4341018.1                 26

**PRAYER FOR RELIEF**

125. Wherefore, Plaintiffs demand judgment against Defendants as follows:

a. Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined above;

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. That the acquisition by Charlotte Pipe of Star Pipe's CISP assets be adjudged to have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

d. That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf of permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

e. That judgment be entered for Plaintiffs and Class members against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law;

f. That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

g. That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

h. For such other and further relief as is just and proper under the circumstances.

///
///
///
///
///

DM1\4341018.1

27

Dated: November 14, 2013

Respectfully submitted,

Eric J. Sinrod
Christopher B. Yeh
**DUANE MORRIS LLP**
One Market Plaza
Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Tel: 415.957.3000
email: EJSinrod@duanemorris.com
email: CBYeh@duanemorris.com

J. Manly Parks (*pro hac vice forthcoming*)
Wayne A. Mack (*pro hac vice forthcoming*)
**DUANE MORRIS LLP**
United Plaza
30 South 17th Street
Philadelphia, Pennsylvania 19103
Tel: 215.979.1342
email: JMParks@duanemorris.com

Kit A. Pierson (*pro hac vice forthcoming*)
Meghan Boone (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1101 New York Avenue, NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: 202.408.4600
email: kpierson@cohenmilstein.com
email: mboone@cohenmilstein.com

Christopher J. Cormier (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410
Tel: 561.833.6575
email: ccormier@cohenmilstein.com

*Attorneys for Plaintiffs*
MOUNTAINLAND SUPPLY, LLC and
MOUNTAIN STATES SUPPLY, LLC